IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

JOHNATHAN JOHNSON,

                              Plaintiff,

                                                    Civil Action No.
            v.                                      9:10-CV-1082 (DNH/DEP)

ADAMS, Doctor, Upstate Correctional
Facility, *et al*.,

                              Defendants.

_____

APPEARANCES:                        OF COUNSEL:

FOR PLAINTIFF:

JOHNATHAN JOHNSON, *Pro Se*
89-A-1042
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN          ADELE M. TAYLOR-SCOTT, ESQ.
Office of Attorney General          Assistant Attorney General
State of New York
Department of Law
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* plaintiff Johnathan Johnson, a prolific inmate litigant who has been granted leave to proceed *in forma pauperis* ("IFP"), has commenced this action pursuant to 42 U.S.C. § 1983 against the former Deputy Commissioner and Director of Health Services for the New York State Department of Corrections and Community Supervision ("DOCCS"), the Superintendent of the correctional facility in which he is incarcerated, and a physician, a physician's assistant, and two registered nurses who work at that prison, alleging deprivation of his civil rights.  In his complaint, Johnson maintains that he has been denied various medications including an inhaler for his alleged chronic obstructive pulmonary disease ("COPD"), Neutrogena soap, and A&D Ointment, and asserts that the denial represents deliberate indifference to his serious medical needs, in violation of the Eighth Amendment, and was in retaliation for his having filed grievances, in violation of his rights under the First Amendment.  Plaintiff's complaint seeks recovery of compensatory and punitive damages in the amount of $1 million each, as well as injunctive and declaratory relief.

Now that discovery is closed, the defendants have moved for summary judgment seeking dismissal of plaintiff's claims on a variety of grounds,

2

including qualified immunity.  Also included within their motion is an

application by the defendants for revocation of plaintiff's IFP status based

upon the "three strikes" provision of 28 U.S.C. § 1915(g).  Because it is

abundantly clear that plaintiff has accumulated three strikes, within the

meaning of that provision, and based upon the lack of any palpable showing

of circumstances sufficient to meet the imminent danger exception to the

three strikes rule, I recommend that plaintiff's IFP status be revoked and that

the remaining portions of defendants' motion be held in abeyance pending

plaintiff's payment of the required $350 filing fee.

I.     BACKGROUND[1]

       Plaintiff is a New York State prison inmate confined under the

supervision of the DOCCS.  *See generally* Complaint (Dkt. No. 1).  At all

times relevant to his complaint, plaintiff was designated to the Upstate

Correctional Facility, located in Malone, New York, and remains confined at

that facility.[2]  *Id.*

---

[1]       In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[2]       Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day.  *See Samuels v. Selsky*, No. 01 CIV. 8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).  Copies of all unreported decisions cited in this document have been appended for the convenience of

In his complaint plaintiff complains of the failure of prison medical personnel at Upstate to provide him with medical care and treatment. Plaintiff alleges, for example, that on April 8, 2010, Physician's Assistant ("PA") Patrick Johnson discontinued his skin allergy medication, A&D Ointment, soap, and stomach medications based upon his alleged failure to attend a scheduled call out on that date.[3]   Complaint (Dkt. No. 1) Statement of Facts ¶ 1.  On June 10, 2010, according to Johnson, Dr. Adams, a physician assigned to work at Upstate, discontinued all of his prescriptions, including his Provincial inhaler for his COPD as well as his Neutrogena soap, a fact which he attributes to Nurses George Waterson and Heath Baker having told Dr. Adams that according to Johnson those medications were not working.[4]  *Id.* at ¶¶ 2-6.  Plaintiff further alleges that on or about May 8, 2010 PA Johnson discontinued plaintiff's skin ointment, and that from March 2010

---

the *pro se* plaintiff.

[3]      It appears from plaintiff's medical records that the discontinuation on April 8, 2010 was a result of his refusal to come out of his cell.  *See* Plaintiff's Medical Records (Dkt. No. 43) Entry Dated 4/8/10.  Those records also reflect that plaintiff was issued Neutrogena Soap, A&D Ointment, and medication for his stomach two days later on April 10, 2010.  *Id.* at Entry Dated 4/10/10.

[4]      In a note authored by a registered nurse on June 12, 2010, it is reported that plaintiff's prescription medications were discontinued by a doctor on June 10, 2010 due to plaintiff's refusal to be seen by the doctor.  *See* Plaintiff's Medical Records (Dkt. No. 43) Entry Dated 6/12/10.  That notation goes on to indicate that the doctor would consider the plaintiff's need for medication once he was seen for a medical evaluation.  *Id.*

to the date of filing of his complaint Nurses Baker, Waterson, and others continuously denied him medical care and treatment for his medical conditions.[5] *Id.* at ¶¶ 8-11.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on September 9, 2010, and thereafter was granted leave to proceed IFP.[6] Dkt. Nos. 1, 4. Named as defendants in plaintiff's complaint are Dr. Lester Wright, the former Deputy Commissioner and Director of Health Services for the DOCCS; David Rock, the Superintendent at Upstate; Dr. Adams, a medical doctor engaged to perform medical services at Upstate; Nancy Smith, the Nurse Administrator at the facility; Patrick Johnson, a PA at Upstate; and Registered Nurses George Waterson and Heath Baker, all of whom are employed by the DOCCS and assigned to work at Upstate. *Id.*

---

[5] Plaintiff's medical records contain no evidence of cessation of plaintiff's skin ointment on or about May 8, 2010, and in fact indicate that he was provided Vaseline for his skin on that date. *See* Plaintiff's Medical Records (Dkt. No. 43) Entry Dated 5/8/10.

[6] In my order dated December 23, 2010, granting plaintiff's IFP application, I addressed a potential three strikes concern and, while finding that Johnson had indeed accumulated far more than three strikes by the time his complaint was filed, concluded that his allegations met the threshold requirement under the Second Circuit's decision in *Chavis v. Chappius*, 618 F.3d 162 (2d Cir. 2010) for alleging imminent danger. Order dated December 23, 2010 (Dkt. No. 4) at pp. 8-9. In that initial order, however, I went on to note that plaintiff's IFP status would be revoked if, as the case progressed, the court concluded that he did not face imminent danger of serious physical at the time he commenced this action. *Id.*

On December 30, 2011, following the completion of discovery,

defendants moved for the entry of summary judgment dismissing plaintiff's

complaint.[7]  Dkt. No. 42.  In their motion, defendants request revocation of

plaintiff's IFP status based upon 28 U.S.C. § 1915(g).  In addition,

defendants argue that 1) plaintiff's Eighth Amendment cause of action lacks

merit; 2) defendants are not exposed to liability damages for actions taken in

their official capacities; 3) plaintiff cannot demonstrate the irreparable harm

necessary to obtain permanent injunctive relief; 4) defendants  Wright, Rock

and Smith were not personally involved in the constitutional violations

alleged; 5) plaintiff has failed to establish the necessary elements of a

retaliation claim; and 6) in any event, the defendants are entitled to qualified

immunity.  *Id.*  Responses in opposition to defendants' motion were received

from the plaintiff on January 9, 2012, March 15, 2012, and March 16, 2012.

Dkt. Nos. 45, 51, 52.  Defendants' motion, which is now ripe for

determination, has been referred to me for the issuance of a report and

---

[7]        Three separate applications by the plaintiff seeking the issuance of a
preliminary injunction were denied by District Judge David N. Hurd, by decision issued on
February 23, 2012.  Dkt. No. 47.  None of those three motions involved medical treatment
rendered to Johnson at Upstate. Plaintiff has appealed the denial of injunctive relief to the
Second Circuit.  *See* Dkt. No. 48.  The pendency of that appeal, however, does not stand
as a barrier to deciding the pending summary judgment motion or revoking plaintiff's IFP
status.  *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1350 (1989).

recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District

of New York Local Rule 72.3(c).  *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Three Strikes Provision

In their motion defendants invoke 28 U.S.C. § 1915(g), arguing that

under that section plaintiff's litigation history, which includes for greater than

three merit-based dismissals, warrants revocation of his IFP status.

Section 1915(g), which was enacted as part of sweeping inmate

litigation reform brought about by adoption of the Prison Litigation Reform Act

of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), though

engendering far less litigation than some of its PLRA counterparts including,

notably, the exhaustion of remedies requirement of 42 U.S.C. § 1997e(a),

provides that

> [i]n no event shall a prisoner bring a civil action or
> appeal a judgment in a civil action or proceeding
> under this section if the prisoner has, on 3 or more
> prior occasions, while incarcerated or detained in any
> facility, brought an action or appeal in a court of the
> United States that was dismissed on the grounds that
> is frivolous, malicious, or fails to state a claim upon
> which relief may be granted, unless the prisoner is
> under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).  The manifest intent of Congress in enacting this "three

7

strikes" provision was to curb prison inmate abuses and to deter the filing of multiple, frivolous civil rights suits by prison inmates.  *Tafari v. Hues*, 473 F.3d 440, 443-44 (2d Cir. 2007); *Gill v. Pidlychak*, No. 9:02-CV-1460, 2006 WL 3751340, at *2 (N.D.N.Y. Dec. 19, 2006) (Scullin, S.J. & Treece, M.J.). The prophylactic effect envisioned under section 1915(g) is accomplished by requiring a prisoner who has had three previous strikes to engage in the same cost-benefit analysis that other civil litigants must make before deciding whether to commence suit, accompanied by the filing of the full fee – that is, to assess whether the result to be achieved justifies the filing fee expenditure.  *Tafari*, 473 F.3d at 444; *Ibrahim v. District of Columbia*, 463 F.3d 3, 6 (D.C. Cir. 2006).  As the Second Circuit has noted, in the context of PLRA amendments requiring inmates to authorize prison officials to make deductions from inmate accounts to be applied as partial payments of appellate filing fees for prisoners granted *in forma pauperis* status,

> [p]rior to the enactment of the *in forma pauperis* amendments, inmates suffered no economic disincentive to filing law suits.  Indeed, the very nature of incarceration – prisoners have substantial free time on their hands, their basic living expenses are paid by the state and they are provided free of charge essential resources needed to file actions and appeals, such as paper, pens, envelopes and legal materials – has fostered a "'nothing to lose and everything to gain'" environment which allows inmates

8

indiscriminately  to file suit at taxpayers' expense.

*Nicholas v. Tucker,* 114 F.3d 17, 20 (2d Cir. 1997), *cert. denied sub nom.*,

*Nicholas v. Miller*, 523 U.S. 1126, 118 S. Ct. 1812 (1998) (internal citations

omitted); *see also Gill*, 2006 WL 3751340, at *2.

The question of whether the dismissal of a prior action qualifies as a

strike, for purposes of section 1915(g), is a matter of statutory interpretation,

and as such a question for the court.[8]  *Tafari*, 473 F.3d at 442-43.  In

determining whether a dismissal satisfies the failure to state a claim prong of

the statute, implicated in this case, courts have drawn upon the provisions of

Rule 12(b)(6) of the Federal Rules of Civil Procedure for guidance,

particularly in light of the similarity in phrasing utilized in the two provisions.

*Tafari*, 473 F.3d at 442 (citing *Andrews v. King*, 398 F.3d 1113, 1121 (9th Cir.

2005)).

B.   Application of Section 1915(g)

It appears to be firmly established that prior to commencing this action

---

[8]     The Second Circuit has expressed its view that the time for determination of "strikes" is only when the section 1915(g) issue is ripe for adjudication, and that because of the potentially significant consequences flowing from such a finding, a court should not, when dismissing an inmate complaint, contemporaneously signal whether the dismissal should count as a "strike" for the purposes of that section. *DeLeon v. Doe,* 361 F.3d 93, 95 (2d Cir. 2004); *see also Snider v. Melindez*, 199 F.3d 108, 115 (2d Cir. 1999) ("We . . . doubt whether the entry of a strike is properly considered at the time an action is dismissed").

plaintiff had accumulated three or more strikes falling within section 1915(g),

and Johnson seemingly does not dispute this fact.  When asked to list

previous lawsuits relating to his imprisonment in the form utilized to file his

complaint, plaintiff noted simply "three strikes".  *See* Complaint (Dkt. No. 1) §

5.  The fact that Johnson has accumulated at least three strikes is confirmed

in a report and recommendation authored by Magistrate Judge George H.

Lowe, and adopted by Senior District Judge Lawrence E. Kahn, in 2008.  *See*

*Johnson v. Connolly*, No. 9:07-CV-0158 (LEK/GHL), 2008 WL 724167

(N.D.N.Y. Mar. 17, 2008).  In his report in that action, Judge Lowe chronicled

plaintiff's extensive prior litigation history, which at that point included the

filing of forty-six prisoner civil rights actions and, after making the required

analysis, concluded that plaintiff had acquired three strikes at a minimum, for

purposes of section 1915(g), by the time the complaint in that action was

filed.[9]  *Id.* at * 8; *see also Johnson v. Fischer,* No. 11-CV-386 (GLS/DRH),

2011 WL 6945706, at *4 (N.D.N.Y. Dec. 22, 2011) (finding that plaintiff had

accumulated three strikes but could potentially satisfy the imminent danger

exception based upon his allegation that he was the target of enemy gang

---

[9]        According to publically available records, with the subsequent filing of this
action and others, it appears plaintiff has filed in excess of fifty-three civil rights actions,
while incarcerated, not including federal habeas corpus actions, federal court appeals,
state court actions, or state court appeals.

members and prison officials did nothing to protect him, resulting in his being

assaulted).  This is consistent with an earlier determination issued by another

court in 2005 finding that at that time, plaintiff had acquired at least five

strikes.  *See Johnson v. Goord,* No. 05-CV-6084 *slip op.* at p. 2 (W.D.N.Y.,

filed Feb. 28, 2005) (Telesca, J.), and a subsequent finding from that court

later in 2005 that at that point plaintiff had acquired at least eight strikes.

*See Johnson v. Worley*, No. 05-CV-6602, *slip op.* at p. 2 (W.D.N.Y., filed

Nov. 18, 2005) (Siragusa, J.).

I therefore conclude that plaintiff had accumulated well in excess of

three strikes, within the meaning of section 1915(g), by the time this action

was filed.

C.    Imminent Danger Exception

As a safety valve, obviously intended to protect a prison inmate

exposed to potential danger from the harsh consequences of his or her

earlier folly, section 1915(g) provides that a prisoner who is in "imminent

danger of serious physical injury" may avoid application of the three strikes

rule of section 1915(g).  *See* 28 U.S.C. § 1915(g); *see also Malik v.

McGinnis*, 293 F.3d 559, 562-63 (2d Cir. 2002).  In accordance with this

exception, an inmate who has had three prior "strikes" but nonetheless

wishes to commence a new action *in forma pauperis* must show that he or she was under imminent danger at the time of filing; the exception does not provide a basis to avoid application of the three strikes on the basis of past harm. *Malik*, 293 F.3d at 562-63; *see also Chavis v. Chappius,* 618 F.3d 162, 169 (2d Cir. 2010).   An inmate who claims the benefit of this exception must also show that the danger faced rises to the level of exposure to a "serious physical injury."  28 U.S.C. § 1915(g).  The imminent danger claimed by the inmate, moreover, must be real, and not merely speculative or hypothetical.  *Johnson v. Barney*, No. 04 Civ. 10204, 2005 WL 2173950, at *1-2 (S.D.N.Y. Sept. 6, 2005) (finding that inmate's allegation of danger at facility he was not housed at, but may pass through at infrequent occasions in the future, does not establish imminent danger).

For a three-strikes litigant to qualify for the imminent danger exception, his or her complaint "must reveal a nexus between the imminent danger it alleges and the claims it asserts."  *Pettus v. Morgenthau*, 554 F.3d 293, 298 (2d Cir. 2009).  When determining whether the requisite relationship is present a court must examine "(1) whether the imminent danger of serious physical injury that a three-strikes litigant alleges is *fairly traceable* to unlawful conduct asserted in the complaint and (2) whether a favorable

judicial outcome would *redress* that injury." *Id.* at 299 (emphasis in original).

The term "serious physical injury," as utilized in section 1915(g), is nowhere concretely defined, although it has been construed by various courts as including a "disease that could result in serious harm or even death[.]" *Ibrahim*, 463 F.3d at 7.  In deciding whether to invoke the exception, a court must examine the available pleadings, construed in a light most favorable to the plaintiff, to determine whether the plaintiff has alleged a serious physical injury. *McAlphin v. Toney*, 281 F.3d 709, 710 (8th Cir. 2002).  Conditions which have been held to rise to a sufficient threshold level include denial of treatment for infected gums, resulting in damages of infection, *McAlphin*, 281 F.3d at 710; denial of adequate treatment for Hepatitis C, a "chronic and potentially fatal disease," *Ibrahim*, 463 F.3d at 6-7; and patterns of harassment from corrections officers, heart palpitations, chest pains and labored breathing, *Ciarpaglini v. Saini*, 352 F.3d 328, 330-31 (7th Cir. 2003) (finding upon reaching the merits, however, that plaintiff's complaint did not state an Eighth Amendment claim).

Plaintiff's eligibility for IFP status turns on whether he can establish that he faced imminent danger of serious physical injury on September 9, 2010, when this action was filed.  Any potential claim of imminent danger in this

case is belied by plaintiff's complaint as well as other portions of the record

now before the court.  A review of plaintiff's medical records, for example,

reveals that the principal cause of the denial of medical care and medications

of which he complains has been his refusal to be seen by a physician and to

comply with the protocols associated with dispensing those medications,

requiring him to recite his name and DIN number before receiving

medications while in SHU confinement.  *See* Smith Decl. ¶¶ 6-13; *see also*

Plaintiff's Medical Records (Dkt. No. 43); Scott Decl. (Dkt. No. 42-2) Exh. E.,

Transcript of Plaintiff's Deposition of May 6, 2011 at pp. 35-36, 44-45.  This

same conclusion was reached by another court in connection with a

challenge brought by the plaintiff pursuant to New York Civil Practice Law &

Rules ("CPLR") Article 78, with Acting Supreme Court Justice Michael

Melkonian observing the following regarding Johnson's conduct:

> It is noteworthy .   .   . that petitioner fails to mention
> that the medicine has been held back in part because
> of petitioner's refusal to be examined by a facility
> doctor.  Petitioner's refusal to comply with minor
> formalities that he believes are unnecessary
> demonstrates that petitioners [sic] medical conditions
> and his need for the medications are not as important
> to petitioner as his desire to assert himself and
> establish control over how the respondents do their
> work.

Scott Decl. (Dkt. No. 42-2) Exh. D, slip op. at p. 3.  Indeed, during his

deposition Johnson essentially acknowledged that he himself was the cause

of any deprivation of medication, and that were he truly at risk because of

that deprivation he held the key to recurring treatment and medication,

needing only comply with the required protocols, testifying as follows:

> Q.   Mr. Johnson, who is the person who's being allegedly deprived of anything as a result of your behavior?
>
> A.   Johnson.
>
> Q.   Thank you.
>
> A.   Ask me do I care.
>
> Q.   Okay.  It's no sweat off your back then?
>
> A.   As long as I can put a lawsuit in against it, no, it's no sweat off my back.. . .

Scott Decl. (Dkt. No. 42-2) Exh. E, at p. 62.

A careful review of plaintiff's medical records covering the period

leading up to and including when this action was filed, medical personnel at

Upstate attempted, on literally a daily basis, to provide medication and

treatment to the plaintiff in his SHU cell.  Plaintiff's medical records are

replete with notations showing that it was as a result of his actions, including

his refusal to comply with prison policies, that he was not provided with

medications and treatment.  On November 8, 2010, for example, a medical

15

provider (whose signature is illegible) noted the following on plaintiff's

ambulatory health record:

> Upon arrival to cell, asked inmate his name + DIN.
> Inmate refused to provide and responded "you know
> my name + DIN you Homo."  Conversation terminated
> and inmate stated "you'll be named in the lawsuit" and
> continued to shout profanities and insults while Nurse
> was on gallery.  Not provided.

*See* Plaintiff's Medical Records.  (Dkt. No. 43) Entry Dated 11/8/10.  On

many other dates plaintiff hurled obscenities or issue threats toward medical

staff members at the facility.  *See, e.g.,* Plaintiff's Medical Records (Dkt. No.

43) Entry Dated 5/10/10 ("verbally abusive"); 5/16/10 ("verbally

inappropriate"); 5/22/10 ("I/M became verbally abusive"); 5/29/10 ("hollering

obscenities"); 6/22/10 ("swearing, verbal harassment to staff"); 6/26/10

("verbally inappropriate"); 6/28/10 ("verbally abusive"); 7/3/10 ("verbally

inappropriate"); 7/4/10 ("verbally harassing staff", "swearing"); 7/6/10

("verbally abusive"); 7/10/10 ("verbally abusive"); 7/11/10 ("verbally

inappropriate"); 7/17/12 ("swearing at nurse"); 7/18/12 ("swearing at nurse");

7/21/10 ("verbally abusive toward staff"); 7/22/12 ("inappropriate"); 7/23/12

("swearing @ staff, threatening, [with] physical harm"); 7/24/12 ("vulgar

obscene language"); 7/28/10 ("threatening to sexual violate [nurse]"); 7/27/12

("swearing and threatening nurse"); 7/31/10 (stating to nurse "I want to stick

16

my finger up your ass you little slut"); 8/1/10 ("inappropriate"); 8/2/10

("inappropriate verbal harassment"); 8/3/10 ("verbal harassment towards

staff"); 8/4/12 ("verbally abusive swearing at staff"); 8/6/12 ("inappropriate

behavior"); 8/9/12 ("inappropriate @ cell door, swearing at staff threatening

violence"); 8/12/10 ("swearing at nurse"); 8/18/10 (stating to nurse "suck my

dick"); 8/26/10 (stating to nurse that he would come out of cell "if you suck

my dick"); 9/7/10 ("verbally abusive"); 9/8/10 ("swearing verbally

inappropriate"); 9/16/10 ("standing @ cell door yelling"); 9/25/10 (stating to

nurse "get the f_ck away from my window"); 9/26/10 (stating to nurse "I hate

you mother fu_ker"); 9/29/10 ("swearing @ staff"); 10/10/10 ("swearing @

staff, inappropriate behavior"); (10/13/10 "verbally inappropriate"); 10/21/10

(referring to nurse as an "alcoholic"); 10/26/10 ("verbally inappropriate");

10/30/10 ("swearing at nurse"); 11/1/10 ("swearing at staff"); 11/2/10

("swearing at staff"); 11/3/10 ("inappropriate behavior"); 11/7/10 ("vulgar and

inappropriate language toward nurse"); 11/14/10 ("aggressive behavior,

scream extreme vulgarity–unable to redirect behavior"); 11/21/10 ("swearing

at nurse"); 11/22/12 ("swearing at staff"); 11/24/10 ("inappropriate behavior");

11/26/10 ("dangerous behavior"); 11/27/10 ("inmate began yelling swearing

and threatening verbally"); 12/1/10 ("noncompliant, swearing at staff");

17

12/10/12 ("swearing @ nurse"); 12/10/12 ("threatening staff [with] violence");

12/11/12 ("swearing"); 12/24/11 ("swearing @ staff inappropriate language");

12/26/12 ("swearing & name-calling"); 12/28/12 ("swearing at staff"); 12/29/12

(referring to nurse as a "dick sucker"); 1/6/11 ("verbally abusive toward

staff"); 1/17/11 (when asked for name and DIN responding "I'll see you in

court mother fucker"); 1/20/11 ("becoming verbally abusive screaming

obscenities and racial/sexual slurs"); 1/21/11 ("yelling racial and sexual slurs

at RN"); 1/25/12 ("yelling sexual and racial slurs @ an RN"); 1/25/11

("vulgar/inappropriate"); 1/30/12 ("vulgar remarks verbalized").

    At the heart of plaintiff's complaint is his claim that prison officials

discontinued his prescription medications.  Plaintiff's health records show,

however, that plaintiff's prescription drugs were discontinued based upon his

refusal to be seen by the prison physician.  *See* Plaintiff's Medical Records

(Dkt. No. 43) Entry Dated 6/12/10.  On September 18, 2010 – nine days after

commencement of this action -  plaintiff complained of dry skin and gas, and

was provided with sinus medication as well as A&D ointment.  *See* Plaintiff's

Medical Records.  *See id.* at Entry Dated 9/18/10.  On the following day,

plaintiff was provided with Vaseline for his dry skin and athletes foot cream

for a fungal condition.  *See id.* at Entry Dated 9/19/10.

18

In sum, a careful review of the record now before the court, even when viewed in a light most favorable to the plaintiff fails to disclose any basis for concluding at the time this action was filed, he was exposed to imminent danger of serious physical injury.  Plaintiff has therefore failed to demonstrate his entitlement to this narrow exception to the PLRA's three-strike statutory provision.

IV.    SUMMARY AND RECOMMENDATION

Plaintiff, a persistent litigant in this and other courts, brings this action to challenge defendants' failure to provide him with desired medication and treatment while in SHU confinement at Upstate.  A review of the plaintiff's litigation history reveals that without dispute, he has incurred three or more strikes falling within 28 U.S.C. § 1915(g).  The record further fails to disclose a basis to conclude that at the time this action was filed he was in imminent danger of serious physical injury, even under the arguably relaxed standard announced by the Second Circuit in *Chavis*.  A review of plaintiff's litigation history and his conduct during the course of this action makes it clear that to the plaintiff, litigation is a form of recreation of the type which the PLRA's three strikes provision was intended to curb. Plaintiff's repeated filing of actions in this and other courts not only unduly harasses prison officials, but

burdens already over-taxed court resources and those of the Office of the

Attorney General, which is called upon to defend against such claims.

Based upon the foregoing, it is hereby respectfully

RECOMMENDED that plaintiff's *in forma pauperis* status be

REVOKED, and that he be required to pay the required filing fee within thirty

days of the issuance of an order adopting this report and recommendation,

and that his complaint be dismissed in the event of his failure to pay the

statutory $350 filing fee; and it is further hereby

RECOMMENDED, that the substantive portions of defendants'

summary judgment motion (Dkt. No. 42) be held in abeyance, and that in the

event the plaintiff does pay the required filing fee, that the matter be returned

to me for consideration of the remaining portions of defendants' motion.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections must be filed with

the clerk of the court within FOURTEEN days of service of this report.

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72;

*Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this court's

local rules.

Dated:      July 5, 2012
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge



Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy, and Christopher P. Artuz, Defendants.
**No. 01CIV.8235(AGS).**

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

**\*1** Maurice Samuels alleges that while incarcerated at the Green Haven Correctional Facility,[FN1] prison officials searched his cell and confiscated a number of documents which were deemed to be "subversive" and contraband. Samuels claims that the materials, including theological textbook excerpts, were of a Christian nature and were used in a course he taught in the prison through the New York Theological Seminary. Samuels' alleged possession of these documents led to a misbehavior report and a subsequent disciplinary hearing, for which Samuels was sentenced to 180 days in keeplock and 180 days' loss of packages, commissary privileges, and telephone use. Samuels also alleges that instead of being punished as per his disciplinary hearing, he was sentenced to a more severe punishment, 180 days in a special housing unit which entailed Samuels' being locked in his cell for twenty-three hours per day. On the basis of the allegedly unlawful sanctions to which he was subjected, Samuels has filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of, *inter alia,* his First Amendment and due process rights, and seeks equitable relief and damages.

Defendants have filed a motion to dismiss the action pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue that they enjoy qualified immunity barring this suit. For the reasons set forth below, defendants' motion is granted in part and denied in part.

FN1. Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

II. Factual Background [FN2]

FN2. Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se.* As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. [FN3] While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. [FN4] At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?,* SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

*2 a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

FN5. While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

FN6. The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf.[FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

FN7. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

FN8. Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999.[FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre,[FN10] summarized his findings as follows:

FN9. Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

FN10. The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurre," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

[FN11.] Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**\*5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally-based and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] *See id.*

> **FN12.** Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

> **FN13.** No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> **FN14.** In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his]

claim[s] which would entitle [him] to relief." ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

**\*6** Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). See *Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. See Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at \*2-\*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later First Amendment brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled "Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

FN15. The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002), is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ § 1997e(a) ][FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at *2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at \*21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at \*15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> FN17. The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> FN18. There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See Flanagan,* 2002 WL 122921, at \*2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002) (noting that in the Second Circuit, confinement in a special

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

B. Due Process

1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of

which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions."[FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at \*22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Walker,* at \*21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at \*21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at \*21.

> FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at \*22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

**2. Whether Samuels Received the Process Due Him**

Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-page affidavit by Inmate Grievance Program Director Thomas G. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be

Samuels' grievance file. Defendants have failed to submit, *inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While this Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.' " *Id.* at *9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at *9.

**a. Witnesses**

**\*12** Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [FN20] Dismissal is therefore inappropriate.

> FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.'" *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient evidence.

c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

"limited" assistance to which Samuels is entitled.[FN21] Such a failure potentially implicates Samuels' due process rights. *See Ayers v. Ryan,* 152 F.3d 77, 80-81 (2d Cir.1998). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

> FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

**d. Actions of the Hearing Officer**

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

**e. Timeliness of the Hearing**

*14 Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a). In this case, Samuels' rights were not violated.

The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord,* 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000) (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

**f. Notice**

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord,* 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

**C. Retaliation**

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g., Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed

to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." *Colon,* 58 F.3d at 873.

FN22. Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

supervisor.

3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition.*" Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

7. Jeffery McKoy

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the

misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 3751340 (N.D.N.Y.)

(Cite as: 2006 WL 3751340 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Anthony G. GILL, Plaintiff,
v.
Chris PIDLYPCHAK, Correction Officer and T.G.
Dygert, Correction Officer, Defendants.
No. 902-CV-1460 (FJS/RFT).

Dec. 19, 2006.
Anthony G. Gill, of counsel, Comstock, NY, Plaintiff, Pro
Se.

Hon. Eliot Spitzer, Attorney General of the State of New
York, Douglas Goglia, Esq., Asst. Attorney General, of
counsel, Albany, NY, for Defendants.

***DECISION AND ORDER***

FREDERICK J. SCULLIN, JR., S.J.

**\*1** The above-captioned matter having been presented
to me by the Report-Recommendation of Magistrate Judge
Randolph F. Treece filed November 20, 2006 and the
Court having reviewed the Report-Recommendation and
the entire file in this matter, and no objections to said
Report-Recommendation having been filed, it is hereby

**ORDERED,** that the Report-Recommendation of
Magistrate Judge Randolph F. Treece filed November 20,
2006 is **ACCEPTED** in its entirety, for the reasons stated
therein; and it is further

**ORDERED,** that the Order granting Gill's IFP status
is **VACATED;** and it is further

**ORDERED,** that Defendants' Letter-Motion seeking
dismissal of Gill's Complaint pursuant to 28 U.S.C. §
1915(g) is **GRANTED** unless Gill pays the filing fee of
$150.00 within thirty days of this final order.

**IT IS SO ORDERED.**

RANDOLPH F. TREECE, United States Magistrate
Judge.

***REPORT-RECOMMENDATION and ORDER***
**I. INTRODUCTION**

Pro se Plaintiff Anthony Gill brings this civil action
pursuant to 42 U.S.C. § 1983, alleging Defendants
violated his civil rights while he was incarcerated at the
Auburn Correctional Facility. Dkt. No. 1, Compl. FN1
Specifically, Gills alleges Defendants Pidlypchak and
Dygert filed false misbehavior reports against him and
harassed him in retaliation for the filing of numerous
institutional grievances against them and a civil lawsuit
against Pidlychak for smoking violations. Compl., Pl.'s
Statement of Facts.

FN1. On December 23, 2002, Defendants filed a
Motion to Dismiss Gill's Complaint pursuant to
FED.R.CIV.P. 12(b)(6) for failure to state a
claim upon which relief can be granted. Dkt. No.
6, Mot. to Dismiss. By Order of the Honorable
Joseph M. Hood, United States District Judge for
the Eastern District of Kentucky sitting by
designation, Defendants' Motion was granted
dismissing Gill's complaint with prejudice. Dkt.
No. 17, Decision & Order, dated July 28, 2003.
Judgment was entered on August 1, 2003 and
Gill appealed. Dkt. Nos. 18 & 19, Notice of
Appeal, dated Aug. 4, 2003. The Second Circuit
affirmed the District Court's dismissal of Gill's
Eighth Amendment claim, but vacated the
Judgment of the District Court dismissing Gill's
First Amendment claim and remanded the action
back to the District Court. Gill v. Pidlypchak,
389 F.3d 379 (2d Cir.2004).

Presently before the Court is Defendants'
Letter-Motion requesting an order revoking Gill's in forma
pauperis (IFP) status and conditionally dismissing this
action pursuant to 28 U.S.C. § 1915(g) pending Gill's
prompt payment of the statutory filing fee of $150.00. FN2
Dkt. No. 35, Defs.' Lt.-Mot., dated June 19, 2006, at p. 1.
Gill opposes the motion. Dkt. No. 38, Pl.'s Lt.-Resp.,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3751340 (N.D.N.Y.)

(Cite as: 2006 WL 3751340 (N.D.N.Y.))

dated July 21, 2006. For the reasons that follow, it is hereby recommended that the Order granting Gill's IFP status be **vacated** and that Defendants' Motion pursuant to § 1915(g) be **granted** unless Gill pays the filing fee of $150.00 **within thirty days (30) days** of the entry of the final order by the District Court.

> FN2. Although Defendants' Letter-Motion states $250.00 as the required filing fee for this action, Defs.' Lt.-Mot. at p. 1, "[D]efendants and their counsel acknowledge that the filing fee was $150.00 when this action was commenced, and their request that [P]laintiff be required to fully pay a filing fee of $250.00 to avoid the dismissal of this action was merely an oversight." Dkt. No. 37, Defs.' Lt.-Reply, dated July 27, 2006, at p. 1.

## II. DISCUSSION

### A. 28 U.S.C. § 1915

Under 28 U.S.C. § 1915, individuals may seek leave of the court to pursue their claims without prepayment of fees and costs and proceed with the litigation as a poor person or *in forma pauperis*. 28 U.S.C. § 1915(a)(1). The IFP statute enables prisoners to similarly apply for this privilege, and indeed, many, if not most, incarcerated individuals bringing suits have taken advantage of such opportunity. *Id.* at § 1915(a)(2). Also under this statute, a court may *sua sponte* dismiss a case if it determines that such action is (1) frivolous or malicious, (2) fails to state a claim on which relief may be granted, or (3) seeks monetary relief against a defendant who is immune from such relief. *Id.* at § 1915(e)(2).

**\*2** Recognizing the potential for prisoner abuse and seeking to relieve congestion of patently frivolous prisoner suits, Congress enacted the Prisoner Litigation Reform Act (**PLRA**) of 1996, which renders several restrictions on a **prisoner's** ability to exploit the justice system. One such mechanism is the so-called "three **strikes** rule" which bars inmates from proceeding IFP after three or more previous claims, where the prisoner was granted IFP status, have been **dismissed** as "frivolous, malicious, or [for] fail[ing] to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." *Id.*

In recognizing the legitimate government interests fostered by the **PLRA** amendments, the Second Circuit stated that,

> [p]rior to the enactment of the *in forma pauperis* amendments, inmates suffered no economic disincentive to **filing lawsuits**. Indeed, the very nature of incarceration-prisoners have substantial free time on their hands, their basic living expenses are paid by the state and they are provided free of charge the essential resources needed to **file** actions and appeals, such as paper, pens, envelopes and legal materials-has fostered a " 'nothing to lose and everything to gain' " environment which allows inmates indiscriminately to **file** suit at taxpayers' expense. *See Anderson v. Coughlin,* 700 F.2d 37, 42 (2d Cir.1983) (quoting *Jones v. Bales,* 58 F.R.D. 453, 463-64 (N.D.Ga.1972), *aff'd,* 480 F.2d 805 (5th Cir.1973).

> *Nicholas v. Tucker* 114 F.3d 17, 20 (2d Cir.1997).

In calculating which cases **count** towards the three **strikes** rule, a court may look to **dismissals** which predated the enactment of the **PLRA**. *Welch v. Galie,* 207 F.3d 130, 132 (2d Cir.2000). The Second Circuit has held such a calculation to be proper and constitutional given that the determination to revoke IFP status in no way affects the merits of the **prisoner's** case, but rather prevents the inmate from continuing suit without the payment of fees. *Id.*

### B. Gill's "Three Strikes"

As noted by the Second Circuit, Gill "is no stranger ... to the federal courts." *Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004). He "has **commenced** at least 116 different [actions] against the State of New York, its executive agencies, and its officials and employees, *see Gill v. Calescibetta,* 00-CV-1553, Decision & Order, dated Aug. 5, 2004, at p. 3, n. 2 (N.D.N.Y.); has **filed** at least thirty-nine (39) different **lawsuits** in district courts within the Second Circuit, *see* Defs.' Lt.-Mot., Supp. 4; and has initiated nineteen (19) suits, in addition to the pending action, in this District alone.[FN3] In fact, this Court has previously held that in light of Gill's experience in federal court and his overly litigious nature, he is not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3751340 (N.D.N.Y.)

(Cite as: 2006 WL 3751340 (N.D.N.Y.))

entitled to "the special solicitude afforded [to] *pro se* litigants [.]" *Gill v. Riddick,* 2005 WL 755745, at *2 (N.D.N.Y. Mar. 31, 2005).

> FN3. *See* (1) *Gill v. LeFevre,* 85-CV-1534 (HGM/RWS) (closed on Jan. 17, 1992-failure to prosecute); (2) *Gill v. Padilla,* 88-CV-147 (NPM/RWS) (closed on Mar. 26, 1992-failure to prosecute); (3) *Gill v. Burch,* 94-CV-369 (FJS/DNH) (closed on Apr. 1, 1999-Defs.' Mot. for Summ. J. granted); (4) *Gill v. Kramer,* 98-CV-45 (FJS/GJD) (closed on Sept. 30, 1999-Stip. of Discont.); (5) *Gill v. Anderson,* 98-CV-1472 (LEK/GLS) (closed on Mar. 3, 2003-Defs.' Mot. for Summ. J. granted); (6) *Gill v. Gummerson,* 99-CV-761 (NAM/DEP) (closed on Aug. 20, 2003-Jury Verdict for Defs.); (7) *Gill v. Dann,* 00-CV-566 (NAM/RFT) (closed on Nov. 21, 2001-failure to prosecute); (8) *Gill v. Tuttle,* 00-CV-585 (DNH/DRH) (currently pending); (9) *Gill v. Doe,* 00-CV-983 (GLS/DEP) (closed on June 8, 2004-Defs.' Mot. for Summ. J. granted); (10) *Gill v. Calescibetta,* 00-CV-1553 (LEK/DEP) (currently stayed); (11) *Gill v. McGinnis,* 00-CV-1787 (LEK/RWS) *(habeas corpus* petition transferred to S.D.N.Y. on Dec. 19, 2000); (12) *Gill v. Smith,* 00-CV-1905 (FJS/GJD) (currently pending); (13) *Gill v. Butero,* 01-CV-82 (LEK/DRH) (closed on Apr. 30, 2003-Defs.' Mot. to Dismiss granted at trial); (14) *Gill v. Hoadley,* 01-CV-323 (FJS/DEP) (currently pending); (15) *Gill v. Steinberg,* 02-CV-82 (DNH/DEP) (closed on Feb. 19, 2004-Stip. of Discont.); (16) *Gill v. Pflueger,* 02-CV-130 (DNH/GJD) (closed on Jan. 30, 2003-Defs.' Mot. to Dismiss granted); (17) *Gill v. Coyne,* 02-CV-1380 (TJM/GHL) (closed on June 22, 2006-Defs.' Mot. for Summ. J. granted); (18) *Gill v. Erickson,* 02-CV-1573 (LEK/RFT) (transferred to S.D.N.Y. on Jan. 21, 2003); and (19) *Gill v. Riddick,* 03-CV-1456 (NAM/RFT) (currently pending).

When Gill commenced this action on November 20, 2002, he had already acquired at least three "strikes" for purposes of § 1915(g). A review of the cases cited in Defendants' Letter-Motion shows that Gill, while incarcerated or detained, brought actions on three or more occasions that were dismissed for "strike" reasons: *Gill v. Accettulli,* 92-CV-5039 (S.D.N.Y. July 8, 1992) (dismissed *sua sponte* as "lack[ing] an arguable basis either in law or in fact") (internal quotation marks and citations omitted); *Gill v. Anna M. Kross Center,* 92-CV-9326 (S.D.N.Y. Dec. 28, 1992) (dismissed *sua sponte* as "lack[ing] an arguable basis either in law or in fact") (internal quotation marks and citations omitted); *Gill v. LeFevre,* 85-CV-1534 (N.D.N.Y. Jan. 13, 1992) (dismissed for failure to prosecute pursuant to FED.R.CIV.P. 11); and *Gill v. Padilla,* 88-CV-147 (N.D.N.Y. Mar. 24, 1992) (dismissed for failure to prosecute pursuant to FED.R.CIV.P. 11).[FN4] Defs.' Lt.-Mot. at p. 2.

> FN4. In their Letter-Motion, Defendants' assert that "[i]n light of *Gill v. Eberhardt,* 04-CV-197Sc (W.D.N.Y. July 30, 2004), Gill is collaterally estopped from asserting that he has not accrued four 'strikes' by the end of 1992, and at least six 'strikes' in total." Defs.' Lt.-Mot. at p. 2, n. 4; *see* Defs.' Lt.-Reply at p. 2. Defendants' concede, however, that two of six actions cited as "strikes" by the Western District in the *Eberhardt* decision, *"Gill v. Anderson* and *Gill v. Pflueger* [,] ... were dismissed after this action was commenced, and therefore, do not count as 'strikes' for purposes of assessing whether Gill is entitled to IFP status[.]" Defs.' Lt.-Mot. at p. 2. Therefore, Defendants' rely on the remaining four cases to support their conclusion that Gill has acquired the requisite "three strikes" to revoke his IFP status. While the Court agrees with Defendants' conclusion, we do not rely on Defendants' estoppel reasoning as the *Eberhardt* case was not decided by the Western District until after Gill commenced this action. We, instead, engage in our own independent review of the cases cited in the *Eberhardt* decision.

## C. Application of *Snider v. Melindez* and *DeLeon v. Doe*

**\*3** Gill contends that § 1915(g) does not apply to him because the cases cited in Defendants' Letter-Motion as "strikes" do not meet the requirements set forth by the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3751340 (N.D.N.Y.)

(Cite as: 2006 WL 3751340 (N.D.N.Y.))

Second Circuit in *Snider v. Melindez,* 199 F.3d 108 (2d Cir.1999) and clarified in *DeLeon v. Doe,* 361 F.3d 93 (2d Cir.2004). Pl.'s Lt.-Resp. at pp. 2-3. According to Gill, the cited cases "fail to indicate w [h]ere dismissals [were] with prejudice or without prejudice as mandated in *Snider.*" Pl.'s Lt.-Resp. at p. 3.

In *Snider v. Melindez,* the Second Circuit held that the "three strikes rule" was intended to apply to those "nonmeritorious suits dismissed with prejudice, not suits dismissed without prejudice for failure to comply with a procedural prerequisite." *Snider v. Melindez,* 199 F.3d at 111.[FN5] The Court noted in that case that there are a variety of procedural reasons for which a case may be dismissed *sua sponte* and such a dismissal does not necessarily render a determination on the merits as, for example, a dismissal for frivolousness would. *See id.* at 111-113. Indeed, the Supreme Court has directed that an action is frivolous when it is based on an indisputably meritless legal theory or presents factual contentions that are clearly baseless, thus such dismissal is one on the "merits" of the case. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989) (cited in *Welch v. Galie,* 207 F.3d 130, 132 (2d Cir.2000)).

> FN5. In *Snider,* the Second Circuit held that a pre-answer dismissal based upon a failure to exhaust administrative remedies is a dismissal for failure to comply with procedural prerequisites and such a non prejudicial dismissal does not count towards the "three strikes rule."

In *DeLeon v. Doe,* the Second Circuit, in upholding its ruling in *Snider,* reiterated that "district court judgments *should* clearly set forth the reasons for dismissal, including whether the dismissal is because the claim is frivolous, malicious, or fails to state a claim, whether it is because the prisoner has failed to exhaust an available administrative remedy, or for other reasons." 361 F.3d at 95 (emphasis in original) (internal quotation marks omitted). The Second Circuit further noted that "[t]hese judgment[s] should also state whether the dismissal is with prejudice or without," and that "[c]larifications of this sort 'will undoubtedly assist subsequent courts that must determine whether a plaintiff is barred from maintaining an action *in forma pauperis* by the three strikes rule of Section 1915(g).' " *Id.*

Gill's interpretation of *Snider* and *DeLeon* as they apply to the cases cited by the Defendants is flawed. First, although *Snider* is clear in its application to those cases dismissed on the merits, the Second Circuit does not mandate that district courts expressly use the language "with or without prejudice" in judgments of dismissal. The language used by the Second Circuit, specifically the term "should," indicates that the language is advisory or instructive rather than mandatory. If the Second Circuit had intended district courts to include this specific language, as Gill argues, it would have stated that the district courts "must" or "shall," which indicates a mandate or requirement.

**\*4** Second, Gill's arguments display a crafty articulation of both the *Snider* and *Doe* cases as they apply to § 1915(g) strikes. Both cases addressed the issue of "whether the entry of a strike [under § 1915(g) ] is properly considered *at the time an action is dismissed.*" *Id.* (citing *Snider v. Melindez,* 199 F.3d at 115) (emphasis added). While the Second Circuit expressed strong doubt about this issue in *Snider,* it decided the matter in *DeLeon* and held that "district courts should not issue these **strikes** one by one, in their orders of judgment, as they dispose of suits that may ultimately-upon determination at a proper time-qualify as **strikes** under the terms of § 1915(g)."[FN6] *Id* .

> FN6. The Second Circuit in *DeLeon* based its holding on its rationale in *Snider,* which reads:
>
> > The designation of **strikes** has no practical consequences until a defendant in a **prisoner's lawsuit** raises the contention that the **prisoner's** suit or appeal may not be maintained *in forma pauperis* pursuant to 28 U.S.C. § 1915 because the prisoner has accumulated three **strikes**. At that time, because a practical consequence turns on the answer to the question, a court will need to determine whether the prisoner should be charged with three **strikes**. Litigation over the issue at an earlier juncture would involve the courts in disputes that might never have any practical consequence.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3751340 (N.D.N.Y.)

(Cite as: 2006 WL 3751340 (N.D.N.Y.))

*DeLeon v. Doe,* 361 F.3d at 95 (quoting *Snider v. Melindez,* 199 F.3d at 115).

The Second Circuit also stated that "[c]ontemporanous classification of dismissals as strikes or non-strikes at a time when the ruling has no immediate consequences may also lead district courts to undertake such classifications carelessly, and with inadequate explanation of why a given dismissal falls into one category and not the other." *Id.* (quoting *Snider v. Melindez,* 199 F.3d at 115, n. 4).

Here, Gill challenges four cases cited by the Defendants as "strikes." Pl.'s Lt.-Resp. at p. 3. Addressing these cases specifically in light of Gill's arguments and as noted above, we find that all four actions were dismissed on the merits and therefore, qualify as "strikes" against Gill for purposes of the "three strikes rule."

Although the Southern District in deciding *Accettulli* and *Kross* did not expressly state that the cases were dismissed "with prejudice" in the orders of dismissal, the District Court dismissed Gill's claims in both cases because they "lack[ed] an arguable basis either in law or fact." *Gill v. Accettulli,* 92-CV-5039, Order of Dismissal, dated July 8, 1992, at p. 4 (S.D.N.Y .) (citing *Neitzke v. Williams,* 490 U.S. at 325); *Gill v. Anna M. Kross Center,* 92-CV-9326, Order of Dismissal, dated Dec. 28, 1992, at p. 2 (S.D.N.Y.) (citing *Neitzke v. Williams,* 490 U.S. at 325). Additionally, in *Kross,* the district court went on to "certify pursuant to 28 U.S.C. § 1915(a) that any appeal from this order would not be taken in good faith." *Kross,* 92-CV-9326, at p. 2. Most importantly, Gill himself concedes that both the *Accettulli* and *Kross* cases "were dismissed due to they lacked an arguable basis in law or in fact." Pl.'s Lt.-Resp. at p. 3. In light of these statements and Gill's concession, the dismissals of the claims in these cases were clearly on the merits, even though the court did not specifically use the language "with or without prejudice." Each of these cases would, therefore, qualify as "strikes" against the Plaintiff.

A review of the docket shows that both the *LeFevre* and *Padilla* cases were dismissed by the Northern District for failure to prosecute pursuant to Rule 11 of the Federal Rules of Civil Procedure.[FN7] By his own admission, Gill concedes that these two cases were dismissed pursuant to FED.R.CIV.P. 11. Irrespective of specific language used in the District's Decisions and Orders dismissing these actions, we find that a Rule 11 dismissal is a dismissal on the merits. Therefore, these two cases would also each qualify as "strikes" against the Plaintiff.

FN7. A history of failure to prosecute is akin to the filing of a frivolous claim.

From the discussion and analysis above, it is clear that these types of dismissals are precisely what Congress had in mind when it enacted the PLRA, hoping to discourage and limit the amount of *frivolous* lawsuits brought by prisoner litigants. Accordingly, the Court finds that Gill, while incarcerated or detained, had acquired at least three "strikes" at the time he commenced the present action.

**D. Exception to the "Three Strikes Rule"**

*5 Notwithstanding prior dismissals, an inmate can overcome the "three strikes rule" and proceed with an action if the prisoner can show that he or she "is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g). This imminent danger exception, however, applies only to impending harms that existed at the time the complaint is filed, and not to those harms which already occurred. *Malik v. McGinnis,* 293 F.3d 559, 563 (2d Cir.2002) ( "[T]he language of § 1915(g) makes clear that the 'imminent danger' exception only applies to danger existing at the time the complaint is filed."). Based upon a review of Gill's Complaint, there is nothing to suggest that he was under imminent threat of serious physical injury at the time he filed his Complaint. While Gill raises this exception in his opposition to Defendants' Motion, his claim that he "was encountering impending harms at the time [he] filed this [C]omplaint due to [the fact that] he was still incarcerated at Auburn C[orrectional] F[acility]" is clearly insufficient to overcome the "three strikes rule." Pl.'s Lt.-Resp. at p. 2. Permitting a prisoner to defeat the "three strikes" bar by simply citing incarceration as the impending harm runs afoul of Congress' intent in enacting § 1915 and would essentially render the PLRA meaningless.

**E. Revoking Gill's IFP Status**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3751340 (N.D.N.Y.)

(Cite as: 2006 WL 3751340 (N.D.N.Y.))

Gill argues that the Defendants are estopped from moving to revoke his *in forma pauperis* status because they failed to move for revocation during earlier proceedings, specifically in their Rule 12(b)(6) Motion to Dismiss, filed on December 23, 2002, *see* Dkt. No. 6, in their Letters to the Court in support of their Motion to Dismiss, filed on April 24, 2003 and May 7, 2003, *see* Dkt. Nos. 14 & 15, during Plaintiff's oral deposition taken in May 2005, or in Defendants' Answer, filed on June 20, 2006.[FN8] Pl.'s Lt.-Resp. at p. 4.

> **FN8.** Gill also cites applications made by the Defendants to the Second Circuit during his Appeal of Judge Hood's Order and Judgment, *see* Dkt. Nos. 17-19, wherein he alleges Defendants failed to move for revocation of his IFP status, which was granted by the Circuit on August 1, 2003. Pl.'s Lt.-Resp. at pp. 4-5. IFP status granted by the Second Circuit is separate and distinct from IFP status granted by the Northern District. Defendants' objections to IFP status granted by the Second Circuit are not relevant to Defendants' application before this Court and would have no bearing on his IFP status in this District. Further, any objections put forth by the Defendants' in papers submitted to the Second Circuit cannot be accessed or considered by this Court.

Contrary to Gill's suggestion, dismissal is not precluded by the fact that a litigant has already been granted IFP status. "When a court becomes aware of three prior strikes only after granting IFP status, the court may appropriately revoke that status and bar the complaint under § 1915(g)." *Polanco v. Burge,* 05-CV-651, Rep.-Rec. & Order, dated May 12, 2006, at p. 3 (N.D.N.Y) (citing *McFadden v. Parpan,* 16 F.Supp.2d 246, 247 (E.D.N.Y.1998)).

In light of the foregoing, it is recommended that the Order granting IFP status to Gill be **vacated** and that Gill's Complaint be dismissed unless Gill pays the filing fee of $150.00 **within thirty days (30) days** of the entry of the final order by the District Court.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Order granting Gill's IFP status (Dkt. No. 4) be VACATED; and it is further

**RECOMMENDED** that Defendants' Letter-Motion seeking dismissal of Gill's Complaint pursuant to 28 U.S.C. § 1915(g) (Dkt. No. 35) be **GRANTED** unless Gill pays the filing fee of $150.00 **within thirty days (30) days** of the entry of the final order by the District Court; and it is further

**\*6 ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72, 6(a) & 6(e).

N.D.N.Y.,2006.

Gill v. Pidlypchak
Not Reported in F.Supp.2d, 2006 WL 3751340 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Johnathan JOHNSON, Plaintiff,
v.
B. CONNOLLY, Doctor et al., Defendants.
**Civil Action No. 9:07-CV-1237 (TJM/DEP).**

March 15, 2010.

Johnathan Johnson, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of Attorney General, State of New York, The Capitol, Christopher Hall, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Johnathan Johnson, a New York prison inmate and a prodigious litigant, has commenced this suit pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights.[FN1] In his complaint, plaintiff asserts that prison officials at the Upstate Correctional Facility ("Upstate") were deliberately indifferent to his medical needs following his transfer into that facility, including by not providing him with medication previously prescribed for him at other prison facilities, and that his transfer into Upstate was in retaliation for his having engaged in protected activity. Plaintiff's complaint seeks both equitable relief, in the form of an unspecified permanent injunction, and recovery of compensatory and punitive damages.

FN1. In response to a request in the form complaint utilized by the plaintiff seeking information about prior lawsuits, Johnson identifies a single action brought in the New York Court of Claims in November of 2006 but states that he has not commenced any suits in federal court relating to his imprisonment. *See* Amended Complaint (Dkt. No 7) § 4. Despite this statement, which was given under penalty of perjury, the record discloses otherwise. In fact, in this district alone plaintiff has commenced some thirty other actions addressing various aspects of prison life while incarcerated.

Currently pending before the court is defendants' motion for summary judgment seeking dismissal of plaintiff's complaint in its entirety. In their motion, defendants assert that the record does not support either of plaintiff's substantive claims and that they are, therefore, entitled to judgment dismissing those claims as a matter of law. Having carefully considered the record now before the court in light of defendants' motion and plaintiff's arguments in response, I recommend that the motion be granted with respect to all claims except plaintiff's retaliation cause of action against defendant Burge, as to which genuine issues of fact exist precluding summary judgment.

I. *BACKGROUND*[FN2]

FN2. In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

The plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Amended Complaint (Dkt. No. 7). At the times relevant to his claims in this action plaintiff was designated first to the Elmira

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

Correctional Facility, located in Elmira, New York, and later following his transfer out of that prison on November 16, 2006, to Upstate, situated in Malone, New York.[FN3] It appears that at all relevant times plaintiff was designated to special housing unit ("SHU") disciplinary confinement.[FN4] *Id.*

FN3. Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

FN4. The record reflects that plaintiff has been in SHU confinement since 1997 and is currently scheduled to remain there until 2028, a date extending beyond his current maximum prison release date. *See* Hall Aff. (Dkt. No. 68-5) Exh. A. (Transcript of Plaintiff's Deposition, held on January 22, 2009, hereainfter "Johnson Dep. Tr.") at pp. 20-21.

While confined at Elmira, on November 13, 2006 plaintiff apparently was the target of human feces thrown by another inmate in the SHU during plaintiff's scheduled shower period. Complaint (Dkt. No. 7) p. 5-B. That incident prompted the sending by plaintiff of a letter to defendant John Burge, the Superintendent at Elmira, requesting that the videotape footage of the incident be preserved for use in a future lawsuit.[FN5] *Id.*

FN5. In response to his later requests for copies of the videotape, plaintiff was informed that due to a "recorder malfunction" it does not exist. *See* Johnson Aff. (Dkt. No. 69) Exh. A at p. 3.

Two days later, on November 15, 2006, the DOCS Classification and Movement Office, which as a general matter controls inmate facility assignments, received an electronic request that Johnson be transferred out of Elmira. Carvill Aff. (Dkt. No. 68-4) ¶¶ 4, 6, 11 and Exh. A; *see also* Burge Aff. (Dkt. No. 68-3) ¶¶ 9-10. The stated reason for the transfer request was that plaintiff had a

"severe problem at Elmira CF SHU." Carvill Aff. (Dkt. No. 68-4) ¶ 12 and Exh. A. As an explanation for that observation, the statement noted that plaintiff "ha[d] created a management problem in the SHU ... he is disruptive to other [inmates] in the unit ..." and made reference to the November 13, 2006 incident. *Id.* at ¶ 14 and Exh. A. The transfer request was processed by John Carvill, a Classification Analyst with the DOCS. Carvill Aff. (Dkt. No. 68-4) ¶¶ 1, 6, 11 and Exh. A. On recommendation of the SHU unit of the Classification and Movement Office, it was determined by defendant Carvill that the plaintiff should be transferred into Upstate. *Id.* at ¶¶ 9-14. When making that decision Carvill was unaware of plaintiff's contemplation of a lawsuit concerning the feces throwing incident at Elmira on November 13, 2006. *Id.* at ¶ 16.

**\*2** According to the plaintiff, Superintendent Burge, though not present for the throwing incident, spoke with the plaintiff about the transfer on November 15, 2006 from the catwalk adjacent to plaintiff's cell and stated "I'm getting rid of you." Amended Complaint (Dkt. No. 7) p. 5-C; Johnson Dep. Tr. pp. 82-86; Johnson Aff. (Dkt. No. 69) ¶ 12. Other than that statement, during his deposition plaintiff admitted that he has no evidence to support his allegation that Superintendent Burge initiated the transfer request or was otherwise a participant in the decision to place him in Upstate. *Id.* at pp. 89-90.

According to Superintendent Burge, the transfer of a prisoner is typically initiated by the inmate's guidance counselor, who sends a transfer request directly to the DOCS Classification and Movement Office in Albany. Burge Aff. (Dkt. No. 68-3) ¶ 9. Superintendent Burge denies any role in the transfer of Johnson to Upstate and specifically states that he did not ask plaintiff's guidance counselor at Elmira to initiate the transfer request. *Id.* at ¶¶ 11-14. While having no recollection of any conversation with plaintiff regarding the transfer, Superintendent Burge states that it is his practice never to discuss transfers with any inmates. *Id.* at ¶ 5.

Plaintiff was transferred into Upstate on November 16, 2006. *See* Smith Aff. (Dkt. No. 68-2) ¶ 11 and Exh. B. According to plaintiff's medical records, prior to his transfer he had been prescribed various medications including Lactase, a drug prescribed for lactose

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

intolerance; Nasacort, for nasal congestion; Naprosyn, a pain medication; Prilosec for a gastroenterlogical disorder; and Vitamin E lotion for a dry, irritated skin condition. *Id.* at ¶¶ 15-16. As an SHU prisoner at both Elmira and Upstate, by regulation plaintiff was allowed only a twenty-four hour supply of non-prescription items and a seven day supply of prescription medications. [FN6] *Id.* at ¶ 18 and Exh. B, 11/18/06 entry.

> FN6. As an SHU inmate, plaintiff similarly was not allowed to possess creams, lotions, or spray bottles. Smith Aff. (Dkt. No. 68-2) ¶ 19.

Under established protocol, upon his transfer plaintiff's prescription medications should have been packed in a white medication bag and transferred to the medical staff at Upstate. Smith Aff. (Dkt. No. 68-2) ¶ 12. This, unfortunately, did not occur upon plaintiff's transfer. *Id.* at ¶ 13 and Exh. A at p. 3. Instead, plaintiff's medications were packed along with his personal property, and consequently those medications were not received by medical staff at Upstate until December 5, 2006. *Id.* at ¶ 13 and Exhs. A, B.

Plaintiff's medical records reveal that on November 20, 2006, four days after his transfer into Upstate, a physician at the facility ordered a seven day supply of Lactase, Naprosyn, and Prilosec for the plaintiff. Smith Aff. (Dkt. No. 68-2) ¶ 20 and Exh. B, 11/18/06 entry. Plaintiff received those medications on November 21, 2006 and November 24, 2006. *Id.* at ¶ 21 and Exh. C. In the interim, over-the-counter medications were made available to the plaintiff, upon request, to substitute for any lacking prescription medications. *Id.* at ¶ 22. Plaintiff's medical records reveal that, in fact, he did request such non-prescription medication on November 17, 18, and 26, 2006, including Medicidin D for nasal congestion and Ibuprofen for pain. *Id.* at ¶ 22 and Exh. B, 11/18/60 and 11/26/06 entries. The records also reflect that nasal spray was ordered for the plaintiff on December 5, 2006, at the request of a facility nurse, upon her review of plaintiff's records and that on that same date a prison physician, Dr. Connolly, reordered Nasacort to be restarted for the plaintiff. *Id.* at ¶¶ 23-24, and Exh. B, 12/5/06 entry. Plaintiff's medical records also reveal that he was provided Lactaid tablets for his lactose intolerance and that he had daily access to Vitamin E lotion. *Id.* at ¶¶ 27-28 and Exh.

B, 11/18/06 and 11/26/06 entry.

## II. *PROCEDURAL HISTORY*

**\*3** Plaintiff commenced this action on February 15, 2007 and later filed an amended complaint on April 12, 2007, with approval of the court. [FN7] *See* Dkt. Nos. 1, 7. Named as defendants in plaintiff's complaint are B. Connolly, a prison physician at Upstate; C. Atkinson and K. Mulverhill, identified as nurses at that facility; M. Smith, a nurse administrator at Upstate; Elmira Superintendent Burge; Theresa Knapp-David, the DOCS Director of Classification and Movement; Lucien LeClaire, Jr., the acting DOCS Commissioner; N. Bezio, the Deputy Superintendent at Upstate; and Brian Fischer, the acting DOCS Commissioner. *Id.* Plaintiff's complaint asserts two causes of action, alleging that his transfer out of Elmira was in retaliation for his having engaged in protected activity in violation of his rights under the First Amendment and also that the defendants at Upstate were deliberately indifferent to his serious medical needs in violation of his right under the Eighth Amendment to be free from cruel and unusual punishment. *Id.*

> FN7. This action was initiated in the Western District of New York but was transferred to this district as a result of the issuance of an order by District Judge David Larrimer on October 17, 2007. *See* Dkt. No. 16.

Since commencement of the action plaintiff has twice sought preliminary injunctive relief, in both instances requesting that the defendants be directed to transfer him out of Upstate and into another facility for the safety of both Johnson and his family. Dkt. Nos. 21, 41. Those motions were denied by Senior District Judge Thomas J. McAvoy by decisions issued on January 30, 2008 and August 21, 2008, respectively. Dkt. Nos. 30, 48. Plaintiff appealed those denials to the United States Court of Appeals for the Second Circuit. By summary order issued on October 16, 2009, and reissued as a mandate on November 12, 2009, that court affirmed Judge McAvoy's first preliminary injunction denial and ordered the issuance of a briefing schedule with regard to the second. [FN8] *See* Dkt. No. 70.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

FN8. According to publically available information, that appeal remains pending, and was deemed ready as of the week of March 1, 2010. The pendency of that appeal, which addresses only plaintiff's request for interim injunctive relief, does not divest this court of jurisdiction to entertain and decide defendants' pending summary judgment motion. *Webb v. GAF Corp.,* 78 F.3d 53, 55 (2d Cir.1996)

On April 27, 2009, following joinder of issue and the close of discovery, defendants filed a motion for summary judgment seeking dismissal of both of plaintiff's causes of action. Dkt. No. 68. In their motion defendants argue that no reasonable factfinder could conclude either that the plaintiff's transfer out of Elmira was provoked by his contemplation of a suit regarding the November 13, 2006 incident, or that once at Upstate the medical personnel there were deliberately indifferent to his serious medical needs. *Id.* Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 69, which is now fully briefed and ripe for determination and has been referred to me for the issuance of report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Plaintiff's Failure To File A Local Rule 7.1(a)(3) Responsive Statement*

In support of their motion defendants properly filed with the court a statement of material facts alleged not to be in dispute, as required by Northern District of New York Local Rule 7.1(a)(3). That rule imposes a corresponding requirement upon a party who, like the plaintiff, opposes a summary judgment motion, providing that

    **\*4** [t]he opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record

where the factual issue arises. The nonmovant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original).

In opposing defendants' motion plaintiff did not submit the responding statement contemplated under Local Rule 7.1(a)(3). The consequences of this failure are potentially significant. By its terms, Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). Courts in this district have routinely enforced Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond. *See, e.g.,* Elgamil v. Syracuse Univ., No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases) [FN9]; *see also* Monahan v. New York City Dep't of Corr., 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).[FN10]

FN9. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [*Editor's Note: Attachments of Westlaw case copies deleted for online display.]

FN10. As to those facts not contained in the defendants' Local Rule 7.1(a)(3) statements, I assume for purposes of this motion that plaintiff's version of those facts is true, as plaintiff is entitled to the benefit of all inferences at this stage. *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998).

As a counterbalance to this often fatal deficiency, a court has broad discretion to overlook a party's failure to comply with its local rules. *The* Travelers Indemnity Co. of Ill. v. Hunter Fan Co., No. 99 CIV 4863, 2002 WL

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

109567, at \*7 (S.D.N.Y. Jan. 28, 2002) (citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001)). In deference to his *pro se* status, and given that he has actively opposed defendants' motion and that it is fairly clear from his submission which facts are disputed, though without minimizing the importance of Local Rule 7.1(a)(3), I recommend against deeming plaintiff to have admitted the facts set forth in defendants' statement of facts not in dispute.

B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

**\*5** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Retaliatory Transfer Claim*

In their motion defendants contend no reasonable factfinder could conclude that plaintiff's transfer out of Elmira and into Upstate was motivated by his contemplation of a lawsuit regarding the November 13, 2006 incident. Defendants further maintain that even if his protected activity were a motivating factor in the decision, the defendants have shown, as a matter of law, that regardless of the influence of that motive they would have taken the same action toward the plaintiff in any event, thereby establishing a complete affirmative defense to plaintiff's retaliation claim.

When adverse action is taken by prison officials against an inmate and is motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

**\*6** In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion and not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

In this instance, drawing all inferences in plaintiff's favor, the record now before the court sufficiently establishes the first two elements to avoid the entry of summary judgment dismissing this claim. Plaintiff's letter to Superintendent Burge on November 15, 2006, revealing his contemplation of a lawsuit regarding the feces throwing incident, could be viewed as activity protected under the First Amendment. *See Espinal v. Goord,* 558 F.3d 119, 128-29

(2d Cir.2009); *Benitez v. Locastro,* No. 9:04-CV0423, 2010 WL 419999, at \*13 (N.D.N.Y. Jan. 29, 2010) (Mordue, C.J.). Similarly, given his allegation that at Upstate he was allegedly exposed to danger at the hands of known enemy inmates, plaintiff's transfer from one facility into another, even though he was placed in disciplinary SHU confinement at both facilities, could be found by a reasonable factfinder to represent an adverse action sufficient to support a retaliation cause of action. *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998).

Consideration of the evidence related to the third prong of the retaliation test, addressing the question of motivation, brings squarely into focus a controverted fact. At the outset it should be noted that the fact the transfer occurred one day after plaintiff's letter threatening suit was sent gives rise to an inference of retaliatory motivation. *See Bennett v. Goord,* 343 F.3d 133, 138 (2d Cir.2003) (noting that temporal proximity of protected conduct and alleged retaliatory conduct may serve as circumstantial evidence of retaliation). In this instance, however, there is more. According to the plaintiff Superintendent Burge appeared outside of his SHU cell on November 15, 2006 and told him that he was "getting rid of" the plaintiff. Amended Complaint (Dkt. No. 7) at pp. 5-7; Johnson Aff. (Dkt. No. 69) ¶ 12. Notwithstanding defendant Burge's denial of having had that conversation, plaintiff's allegations raise a disputed issue of fact which must be resolved before the third element of the retaliation claim can be determined. *See id.* at 138-39.

**\*7** In their motion, defendants contend that even if plaintiff could establish a *prima facie* case of retaliation, they have successfully established, as a matter of law, that they would have taken the same steps irrespective of the retaliatory animus, thereby establishing a complete defense to plaintiff's retaliation claim. When construed in a light most favorable to the plaintiff, however, the facts reveal that there is a significant question as to whether the motivation offered by the defendants as having prompted the decision was pretextual. *See Gill v. Calescibetta,* No. 9:00-CV-1553, 2009 WL 890661, at \* 3 (N.D.N.Y. mar. 31, 2009) (Suddaby, J. and Peebles, M.J.).

Given the existence of the disputed facts which must be resolved before plaintiff's retaliation claim and defendants' *Mount Healthy* defense can be analyzed, I recommend that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

defendants' motion for dismissal of plaintiff's retaliation claim be denied.[FN11]

> FN11. As will be seen, several of the defendants named by plaintiff in connection with his retaliation cause of action, including Acting Commissioners LeClaire and Fischer, Director Theresa A. Knapp-David, and Deputy Superintendent Bezio, are nonetheless entitled to dismissal of plaintiff's retaliation claim against them based upon their lack of personal involvement in the alleged violation, *see* pp. 25-27, *post,* while others, including Dr. Connolly, Nurses Atkinson, Miles and Mulverhill and Nurse Administrator Smith, do not appear from the record to be linked to plaintiff's retaliation claim.

### D. *Deliberate Medical Indifference Claim*

Defendants' motion also challenges plaintiff's claim that upon his arrival at Upstate medical officials there were deliberately indifferent to his serious medical needs. In support of that motion defendants assert both that the record fails to establish that plaintiff suffers from a medical need of constitutional significance, and, in any event, medical officials at Upstate were not subjectively indifferent to any such need.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of the protected afforded by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976). The Eighth Amendment prohibits the imposition of punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-that is, the conditions alleged must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." See *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 297 & 298, 111 S.Ct. 2321, 2323-2324 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. & Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1970); *Waldo,* 1998 WL 713809, at *2 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1970).

### 1. *Serious Medical Need*

**\*8** In order to meet the objective prong of the governing Eighth Amendment test in a medical indifference case, a plaintiff must first allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also arise where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

worthy of comment or treatment' ", a condition that "
'significantly affects' " a prisoner's daily activities, or "
'the existence of chronic and substantial pain.' " *Chance,
143 F.3d at 702* (citation omitted); *Lafave v. Clinton
County, No. CIV. 9:00CV774, 2002 WL 31309244, at *3
(N.D.N .Y. Apr. 3, 2002)* (Sharpe, M.J.) (citation
omitted).

From the record in this case no reasonable factfinder could
conclude that any of the conditions giving rise to the
prescription medications of which plaintiff was deprived
over an exceedingly brief period while at Upstate qualifies
as serious for constitutional purposes. The medications
involved were directed toward such modest conditions as
lactose intolerance, nasal congestion, ankle pain, a
gastrointestinal condition, and dry or irritated skin. The
record is devoid of any indication that these conditions
presented situations of urgency or resulted in degeneration
or extreme pain over the brief period involved. Indeed,
according to his medical records, plaintiff was seen by
medical staff seven times over a four week period
following his transfer into Upstate, including on
November 16, 17, 18, 26, and 28, 2006 as well as
December 5 and December 18 of that year. Smith Aff.
(Dkt. No. 68-2) ¶ 33 and Exh. B. None of the medical
record entries associated with those examinations reveal
evidence that would support a finding of the existence of
a serious medical condition. Accordingly, I recommend
dismissal of plaintiff's medical indifference claim based
upon his failure to establish the existence of a serious
medical condition.

2. *Deliberate Indifference*

In addition to establishing the existence of a serious
medical need, to prevail on an Eighth Amendment medical
indifference cause of an action a plaintiff must also
establish indifference to that condition on the part of one
or more of the defendants. *Leach, 103 F.Supp.2d at 546.*
Deliberate indifference, in a constitutional sense, exists if
an official "knows of and disregards an excessive risk to
inmate health or safety; the official must both be aware of
facts from which the inference could be drawn that a
substantial risk of serious harm exists, and he [or she]
must also draw the inference." *Farmer, 511 U.S. at 837,
114 S.Ct. at 1979; Leach, 103 F.Supp.2d at 546* (citing
*Farmer, 511 U.S. at 837, 114 S.Ct. at 1979); Waldo, 1998*

*WL 713809, at *2* (same).

*9 A physician's mere negligence in treating or failing to
treat a prisoner's medical condition does not implicate the
Eighth Amendment and is not properly the subject of a *§
1983* action. *Estelle, 429 U.S. at 105-06, 97 S.Ct. at 292;
Chance, 143 F.3d at 703.* "Medical malpractice does not
become a constitutional violation merely because the
victim is a prisoner." *Estelle, 429 U.S. at 106, 97 S.Ct. at
292.* Thus, a physician who "delay [s] ... treatment based
on a bad diagnosis or erroneous calculus of risks and
costs" does not exhibit the mental state necessary for
deliberate indifference. *Harrison, 219 F.3d at 139.*
Likewise, an inmate who disagrees with the physician over
the appropriate course of treatment has no claim under *§
1983* if the treatment provided is "adequate." *Chance, 143
F.3d at 703.* If prison officials consciously delay or
otherwise fail to treat an inmate's serious medical
condition "as punishment or for other invalid reasons,"
however, such conduct constitutes deliberate indifference.
*Harrison, 219 F.3d at 138; Kearsev v. Williams, 2005 WL
2125874, at *5 (S.D.N.Y. Sep. 1, 2005).*

The record now before the court also fails to substantiate
plaintiff's claims of subjective, deliberate indifference on
the part of the defendants The failure of prison officials to
provide him with his prescription drugs immediately upon
his arrival at Upstate appears to have been the result of a
mistake on the part of DOCS medical personnel at Elmira,
who are not named in this complaint, in packing and
forwarding those prescriptions along with plaintiff's
personal belongings rather than following the established
protocol of separately conveying them to the medical staff
at Upstate. The record also reveals that at Upstate plaintiff
was offered alternatives to the medications and that his
prescriptions for most drugs were renewed shortly after his
transfer into the facility. Neither plaintiff's complaint nor
the record now before the court establishes a level of
indifference on the part of any of the named defendants
sufficient to support the subjective element of the
deliberate indifference test. Accordingly, I recommend
dismissal of that cause of action on this additional,
independent basis.

E. *Personal Involvement*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

In their motion defendants also seek dismissal of plaintiff's claims against acting Commissioner's Fischer and LeClaire, defendant Knapp-David, and Superintendent Bezio on the basis that they lacked any personal involvement in the conduct giving rise to plaintiff's constitutional claims.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*10** The four defendants who are the subject of this portion of defendants' summary judgment motion occupy supervisory positions with the DOCS. A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007), *rev'd on other grounds sub nom., Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501.

In this instance plaintiff has adduced no evidence to show any permissible basis to find liability on the part of the four defendants in question. Accordingly, I recommend dismissal of plaintiff's claims against defendants Fischer,

LeClaire, Knapp-David and Bezio on this separate, independent ground.

*F. Qualified Immunity*

In their motion, defendants argue that even if plaintiff can establish a *prima facie* claim of medical indifference or retaliation, defendants should be shielded from liability based upon qualified immunity. Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ----, 129 S.Ct. 808, 815 (2009).

In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at ----, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[FN12] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall-On-Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[FN13] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." [FN14] *Pearson,* 555 U.S. at ----, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

FN12. In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.

FN13. In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

FN14. Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* --- U.S. at ----, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524 (1991) (per curiam)).

*11 For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ...

should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Wright v. Smith,* 21 F.3d at 500 (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v. Miller,* 66 F.3d 416, 420-21 (2d Cir.1995)).

In this instance the surviving claim of retaliation implicates legal principles that were firmly established in 2006, the time of the relevant events. Because there are disputed issues as to whether or not defendant Burge ordered a transfer of the plaintiff out of Elmira in retaliation for his protected activity, an action which could not be said to be objectively reasonable for a superintendent in his position, I recommend denial of

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

defendants' motion for summary judgment based on qualified immunity, without prejudice.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint in this action alleges two discreet causes of action. The first, alleging that plaintiff was transferred out of Elmira and into Upstate at the direction pf defendant Burge in retaliation for his having threatened to commence a lawsuit regarding an incident at Elmira, gives rise to disputed issues of material fact that must be resolved before the questions of whether plaintiff has established the requisite nexus between his protected activity and the transfer, and whether defendants have carried their burden in establishing that they would have taken the same action regardless of the plaintiff's protected activity, can be decided. Turning to plaintiff's cause of action for deliberate medical indifference, because the record fails to establish that he suffers from a serious medical condition of constitutional proportions or that any of the defendants were deliberately indifferent to any such condition, summary judgment dismissing that claim is warranted.

**\*12** Addressing defendants' remaining arguments, I find that the record further fails to disclose any basis for finding that defendants LeClaire, Fischer, Knapp-David, or Bezio were personally involved in the constitutional violations alleged, and that plaintiff has not alleged participation on the part of Dr. Connolly, Nurses Atkinson, Miles and Mulverhill, and Nurse Administrator Smith in the conduct giving rise to plaintiff's surviving retaliation cause of action. Additionally, I conclude that at this juncture, it cannot be said that defendant Burge is protected by qualified immunity from plaintiff's retaliation claim. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 68) be GRANTED, in part, and that plaintiff's deliberate medical indifference cause of action and all claims against defendants Fischer, LeClaire, Knapp-David, Smith, Bezio, Connolly, Atkinson, Miles, and Mulverhill be DISMISSED, leaving only plaintiff's cause of action against defendant Burge for retaliation to be tried in this action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2010.
Johnson v. Connolly
Slip Copy, 2010 WL 2628720 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 6739520 (N.D.N.Y.)

(Cite as: 2011 WL 6739520 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.
Johnathan JOHNSON, Plaintiff,
v.
Brian FISCHER, Lucien LeClaire, Jr., Teresa
Knapp–David and Trudy Lynn–Caron, Defendants.
No. 9:11–cv–386 (GLS/DRH).

Dec. 22, 2011.
Johnathan Johnson, Malone, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, The Capitol, Adrienne J. Kerwin, Assistant
Attorney General, of Counsel, Albany, NY, for the
Defendants.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.
#### I. *Introduction*

**\*1** Plaintiff *pro se* Johnathan Johnson commenced
this action against Brian Fischer, Commissioner of the
New York Department of Corrections and Community
Supervision ("DOCCS"), Lucien LeClair, Deputy DOCCS
Commissioner, Teresa Knapp–David, DOCCS
Classification and Movement staff member, and Trudy
Lynn–Caron, an Upstate Correctional Facility ("Upstate")
counselor, alleging deliberate indifference to his safety
and cruel and unusual punishment in violation of his
Eighth Amendment rights. (Compl., Dkt. No. 1.)
Defendants moved to dismiss Johnson's claims for lack of
**personal involvement** or, in the alternative, for violation
of the "three strike" provision of 28 U.S.C. § 1915(g).
(Dkt. No. 10, Attach.1.) In a Report–Recommendation (R
& R) dated November 28, 2011, Magistrate Judge David
R. Homer recommended that defendants' motion to
dismiss be granted as to Fischer, LeClaire and
Knapp–David and denied as to Lynn–Caron. (Dkt. No. 15
at 10.) Pending are Johnson's objections to that R & R.

(Dkt. No. 16.) For the reasons that follow, the R & R is
adopted in its entirety.
#### II. *Standard of Review*

Before entering final judgment, this court routinely
reviews all report and recommendation orders in cases it
has referred to a magistrate judge. If a party has objected
to specific elements of the magistrate judge's findings and
recommendations, this court reviews those findings and
recommendations *de novo.* See *Almonte v. N.Y. State Div.
of Parole,* No. 04–cv–484, 2006 WL 149049, at \*6–7
(N.D.N.Y. Jan.18, 2006). In those cases where no party
has filed an objection, or only a vague or general objection
has been filed, this court reviews the findings and
recommendations of the magistrate judge for clear error.
*See id.*

#### III. *Discussion*

Johnson objects only to Judge Homer's
recommendation that the claims against Fischer, LeClaire
and Knapp–David be dismissed. (Dkt. No. 16.) Judge
Homer's conclusion that Johnson satisfied the "imminent
danger" exception to 28 U.S.C. § 1915(g)'s "three strikes"
provision and his recommendation that Johnson's claims
against Lynn–Caron survive are, therefore, reviewed for
clear error. *Almonte,* 2006 WL 149049 at \*6–7.

In his objections, Johnson largely reiterates the same
factual and legal assertions contained in his initial claim.
(Dkt. No. 16.) Treating these factual rehashings as specific
objections, the court reviews them *de novo.* The crux of
Johnson's objections is that inaction on behalf of Fischer,
LeClaire and Knapp–David constituted **personal
involvement** in the alleged violation of his constitutional
rights. (Dkt. No. 16.)

Damages in a **section 1983** claim are only appropriate
if the defendant was personally involved in the alleged
constitutional violation. *See Farrell v. Burke,* 449 F.3d
470, 484 (2d Cir.2006) (citations omitted). Ordinarily, the
plaintiff must demonstrate that there is a "tangible
connection between the alleged unlawful conduct and the
defendant." *Balkum v. Sawyer,* No. 6:06–cv–1467, 2011
WL 5041206, at \*4 (N.D.N.Y. Oct.21, 2011) (citing *Bass*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6739520 (N.D.N.Y.)

(Cite as: 2011 WL 6739520 (N.D.N.Y.))

*v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986)). Where, as here, defendants are supervisory officials, a link, under the doctrine of respondeat superior, is inadequate to establish the requisite **personal involvement**. *Polk Cnty. v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). Thus, to prevail against a supervisory defendant, the plaintiff must show that the supervisor:

> ***2** (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

> *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995), *rev'd on other grounds, Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).[FN1]

>> **FN1.** The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) upon the categories of supervisory liability under *Colon.* Lower courts have struggled with this issue, and specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See Sash v. United States,* 674 F.Supp.2d 531,543 (S.D.N.Y.2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.,* No.07 CIV. 1801, 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd,* 387 F. App'x 55 (2d Cir.2010), others disagree and conclude that whether any of the five categories apply in any particular case depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010). Nevertheless, the court, until instructed to the contrary, continues to apply the five factor *Colon* test.

Johnson alleges that he notified Fischer, LeClaire and Knapp–David that he and his family had been threatened by enemy gang members incarcerated at Upstate, but that no action was taken. (Compl., Dkt. No. 1 at 6.) This failure to act, Johnson contends, constituted deliberate indifference. (Dkt. No. 16 at 4.) Mere notification of a present or pending constitutional violation, however, is insufficient to establish **personal involvement** on behalf of a **supervisory** official. *Rivera v. Goord,* 119 F.Supp.2d 327, 344 (S.D.N.Y.2000); *see also Excel v. Woods,* No. 9:07–CV–0305, 2009 WL 3124424, at *21 (N.D.N.Y. Sept.29, 2009); *Walker v. Pataro,* No. 99CIV.4607, 2002 WL 664040, at *12 (S.D.N.Y. Apr.23, 2002) (holding that "where a **supervisory** official like the Commissioner of Corrections ... receives **letters** or similar complaints from an **inmate** and does not personally **respond,** the **supervisor** is not personally involved and hence not **liable.**"). While this rule may not hold true where the defendant is a local prison official, that is not the case here as neither Fischer, LeClaire nor Knapp–David are employed at Upstate. *Haywood v. Woods,* No. 9:01–CV–00225, 2007 WL 1834641, at *10 (N .D.N.Y. June 25, 2007) (noting that the general **supervisor** notification standard does "not translate well ... where the letters alerting prison officials of an **inmate's** plight are directed to local prison officials who plainly are ... positioned to take steps to protect the prison **inmate.**"); (Dkt. No. 10, Attach. 1 at 4 .) Even affording Johnson the special solicitude to which he is entitled, his claims against Fischer, LeClaire and Knapp–David fail to allege **personal involvement,** and therefore must be dismissed. Accordingly, Judge Homer's recommendation that defendants' motion to dismiss be granted as to Fischer, LeClaire and Knapp–Davis is adopted.

The remainder of Judge Homer's R & R is devoid of clear error, and as such, is adopted in its entirety.

**IV.** *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Homer's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6739520 (N.D.N.Y.)

(Cite as: 2011 WL 6739520 (N.D.N.Y.))

November 28, 2011 Report–Recommendation (Dkt. No. 15) is **ADOPTED** in its entirety; and it is further

   **ORDERED** that defendants' motion to dismiss (Dkt. No. 10) is **DENIED** in part as to Trudy Lynn–Caron; and it is further

   **ORDERED** that defendant's motion to dismiss (Dkt. No. 10) is **GRANTED** in part as to Brian Fischer, Lucien LeClair, and Teresa Knapp–David and that all claims against them are **DISMISSED;** and it is further **ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties by mail and certified mail.

   **\*3 IT IS SO ORDERED.**

N.D.N.Y.,2011.

Johnson v. Fischer
Slip Copy, 2011 WL 6739520 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 2173950 (S.D.N.Y.)

(Cite as: 2005 WL 2173950 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Johnathon JOHNSON, Plaintiff,
v.
M.A. BARNEY, Prison Guard, and Oracz, Sergeant,
and Frank J. Tracy, Superintendent, and Sullivan,
Captain, Several Unknown Defendants, Defendants.
No. 04 Civ. 10204(LBS).

Sept. 6, 2005.
*MEMORANDUM AND ORDER*

SAND, J.

**\*1** Plaintiff brought this *pro se* prisoner's civil rights action pursuant to 42 U.S.C. § 1983 alleging that his Eighth Amendment constitutional rights were violated. Defendants now move to dismiss the complaint on the ground that plaintiff is in violation of the Prisoner Litigation Reform Act's "three strikes" provision. *See* 28 U.S.C. § 1915(g).

I. Background

Plaintiff alleges that on October 21, 2003, while temporarily incarcerated at Downstate Correctional Facility ("Downstate"), he was physically assaulted by M.A. Barney, a corrections officer, and three other unidentified corrections offers, while Sergeant Oracz observed the incident. Plaintiff claims that former Superintendent of Downstate, Frank J. Tracy, refused his request to preserve the videotape footage of the incident and that Captain Sullivan fabricated the report of the investigation into the incident.

Plaintiff further claims that he was "provoke[d] and harassed by the same prison guards [involved in the original assault]" when he retuned to Downstate in August 2004.

II. Discussion

Defendants move to dismiss the complaint on the ground that plaintiff is in violation of the Prisoner Litigation Reform Act's "three strikes provision."

Under the PLRA, a prisoner cannot "bring a civil action ... or proceeding [*in forma pauperis* ] if the prisoner, has on 3 or more occasions, while incarcerated or detained in any facility, brought an action ... in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915(g). There is an exception to the three strikes rule, however, where a prisoner is under "imminent danger of serious physical injury." *Id.* Plaintiff does not dispute that he has had more than three actions dismissed as frivolous. The sole question, therefore, is whether the imminent danger exception applies.

The Second Circuit has adopted the construction of this statutory provision that every circuit to consider the issue has reached: the imminent danger exception applies only if a prisoner is under imminent danger of serious physical injury at the time his or her complaint is filed. *Malik v. McGinnis,* 293 F.3d 559, 562-63 (2d Cir.2002); *see also Martin v. Shelton,* 319 F.3d 1048, 1050 (8th Cir.2003) ("[T]he exception focuses on the risk that the conduct complained of threatens continuing or future injury, not on whether the inmate deserves a remedy for past misconduct."). Here, the allegations of danger concern the Downstate Correctional Facility, while plaintiff is generally incarcerated at the Southport Correctional Facility. The fact that plaintiff may pass through Downstate on infrequent occasions in the future means that any threat he faces is merely hypothetical, rather than imminent. Moreover, there is no reason to believe plaintiff would be in danger of serious physical injury on the occasions when he may return to Downstate, for he has alleged only a single incident of past physical assault. Were this enough to constitute an ongoing danger, the requirement that the danger alleged be contemporaneous with the complaint would become almost meaningless.

**\*2** Plaintiff's general allegation of "harassment" at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2173950 (S.D.N.Y.)

(Cite as: 2005 WL 2173950 (S.D.N.Y.))

Downstate during a subsequent stay there is also insufficient to trigger the imminent danger exception. *See Abdul-Akbar v. McElvie,* 239 F .3d 307, 315 (3d Cir.2001) ( "[G]eneralized allegations [of harassment] strike us as insufficient to connect the separate incidents ... into a pattern of threats of serious physical injury that are ongoing.")

Finally, plaintiff attempts to salvage his claim by arguing that Captain Sullivan, who was involved in the incident at Downstate, is currently employed as a corrections officer at Southport, where defendant generally resides. However, the only allegation against Sullivan is that he fabricated a report and not that he in any way physically threatened plaintiff. Therefore, plaintiff's contention that Sullivan's presence at Southport places him in imminent danger is without merit.

III. Conclusion

For the reasons set forth above, defendant's motion to dismiss the complaint is granted.
SO ORDERED.

S.D.N.Y.,2005.

Johnson v. Barney
Not Reported in F.Supp.2d, 2005 WL 2173950 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.